I represent Mr. Abney on this appeal because of the substantial overlap of the issues I will be arguing the matter on behalf of both the parents and the daughter. At this time I would like to reserve three minutes for my time for rebuttal. Thank you. Your Honor, like in many of these Fourth Amendment cases, I think the critical issue here is  that it's a stop. And when we look at that, when we hone in on that important issue, it's quite clear that, and I think there's substantial agreement between the parties, that it's a very limited set of facts. An African-American man goes into Bloomingdale's... I hate to cut you off at the beginning, but I do have a question on this. Is it related from Verna to the dispatch or from Verna to Bednar at all before they get to the car that they're African-American males? Apparently, at least as with respect to one of the persons involved in the incident, yes, that appears in the dispatch that goes out before the stop of the car. Which has a description as a black male with khaki pants and a black tie.           I'm not sure. I'm not sure. I'm not sure. I'm not sure. I'm not sure. Black male with khaki pants and a baseball cap. And which individual would that be? It appears, piecing together the record, it appears that that would be Mr. Abney. As of course, later found out. The police know nothing about the names until well after the car stopped and they started looking at identification. So what they have here is that important. A man goes and buys a Fendi handbag at the Cane and Crutch Mall in Bloomingdale's, then he leaves and goes, leaves the mall, no issue with his credit card, he leaves, gets into an SUV. Later, the police, again this is what the police know, later, not at the same time, never seen together, later, another man from New York attempts to buy another Fendi handbag in Bloomingdale's and he has two credit cards declined. Now, of course, the police also know that that man is trailed out of Bloomingdale's and once he gets to the plaza, the other section of the mall, not out to the SUV, not out to the parking lot, and the mall security at that point just stops following him. So that's what the police know. And then we have the overlay from the Bloomingdale's security guard that Bloomingdale's has had problems in the past with New Yorkers and credit card fraud. So that's all the police know. What they don't know is what Mr. Verna was told by the sales clerk here, that she thinks that Mr. Thompson, the first man involved, was previously under suspicion at Bloomingdale's for another transaction. Police don't know that. Police don't know that in the sales clerk's opinion, at least. When you're going through this recitation and you're going to tell us what they don't know, which I appreciate, you are saying that with the following in mind. That the point in time that you're talking about is before the cars approach. The question is, what do the police know before the cars approach? And that's what you're reciting to us, that the police don't know. All of these facts relate to when the car pulls over in response to the lights, that's the stop. Okay, thank you. So they don't know the allegation, I'll say, that Mr. Thompson had been in Bloomingdale's, that he had been under suspicion by some other loss prevention officer on some previous occasion. They don't know that in the sales clerk's estimation, he purchased his handbags somewhat quickly. And again, even in Mr. Vernon's mind, there's no specificity as to that. The sales clerk said, well, he was sort of quick in buying his handbag. And what the police also don't know is anything about how uncommon it would be for two credit cards to be declined in a sales transaction. Mr. Vernon said... Excuse me, did they know that the credit cards were declined? They did. The second man in Bloomingdale's who was followed out to the plaza, they knew that he attempted to buy a Fendi handbag but had two credit cards declined, and then the transaction didn't occur. And they knew that both had New York identification, or they did not? That's correct, yes. They did know that both had New York identification. So what it boils down to here on reasonable suspicion is two men from New York... Did they know the ages, or did they know whether they were young or old? No. It's not revealed in the record as far as I know. So that's what we have right now. I would assume that is kind of insufficient. I'm sorry, I didn't mean to cut you off. Go through your summary again. Of course. So those are the facts that are known. That's what's not known. Now, once we boil that down and recognize that, I would suggest that reasonable suspicion is really lacking here. The police really had nothing more than if one of us had gone up to New York and went into a fancy boutique and bought an expensive item, and before we left midtown was stopped by the police because 15 minutes, 20 minutes, half an hour after us, someone else from Philadelphia had used two of our credit cards. Well, if we say that that's an... I mean, are you seeing a heightened standard for a tariff stop in effect by requiring that the officers have more for a tariff stop inquiry? This is building an inquiry to men, both from New York, buying the identical product. One of them had two credit cards, which are not acceptable. Why is that not sufficient under tariff just for a brief stop to have a tariff discussion? First of all, I am not arguing for a heightened standard at all. This is really reasonable suspicion. We feel we're well on this line, and here's why. Because there's absolutely no... The only suspicious, and I'll say very mildly, in my opinion, mildly suspicious circumstances here are a vague closeness in time and two men from New York. Well, on the other hand, you have the department store having a history of this type of thing, and you have the information coming to a police officer from a reliable source. It's about something off the wall. He knows who he's dealing with. So that... Why wouldn't a reasonable police officer think, well, this is something I would just... Let me just talk to these people. I don't have problem cause. Why wouldn't it be enough to... Without having to invoke any heightened standard for a tariff stop. Wouldn't a reasonable police officer... Excuse me. Wouldn't a reasonable police officer be within his justification of being suspicious of having the information coming from reliable sources that two men, both from New York, both using New York identification, buying the exact same product that I'm trying to, expensive products. These are not everyday products. They're from out of state. They're at a destination mall. How can we fault a police officer for being suspicious and wanting just a tariff stop? I think quite easily, Robert. There's absolutely nothing in the record here. How many people... Let me take a couple steps back. Number one, these are not identical bags. They're both Fendi handbags, but they're not identical bags. They're not identical. They're the same thing. They're in the top drawer. Number two, Your Honor referred several times to the reliability of the security officer. And I do want to address that. But let me set that aside for one second. What else is missing? This is, as Your Honor pointed out, this is the King of Prussian Mall. This is a major department store. We have no idea in this record, and certainly the police didn't know, how many people go to this handbag counter a day. Do they make two sales a day? Do they sell 20 bags a day? How many New Yorkers come in? How many African Americans are there? Why was there a suspicion peaked about that? Now, there's all sorts of background facts here that are missing here that the police did not know that would potentially weigh into the situation. And what you have left, when you circle in what's not known, is you have vague timing, and you have New Yorkers, and you have this allegation that we've had previous problems with New Yorkers. Now, as to the reliability of the officer, this is an important point, because I think fundamentally the government here, as this case has fallen through the briefing, has realized that their best argument is that, well, even though these other facts were never conveyed to the police, somehow the police can sort of rely on them anyway, just because this Mr. Verma was a security guard, and while he was, we can suppose, he was reliable, he was almost an adjunct police officer or something like that. Nothing else can be further from the truth. First doctrinally, it's quite clear that facts from informant, no matter how, no matter what their reliability, facts that are not conveyed to the police by an informant don't count. No, no, we're not counting that. That's true. Everyone knows that. There's no question. But the government argues that they are. Well, that's a false argument. If they're arguing to be able to rely on that, sure. Sir, if they're arguing, their brief argument is that, and believe me, that's a false argument, I can tell you right now. Well, that's important, but so doctrinally that doesn't work. But the other reason it doesn't work is because there really isn't any record of reliability here. Your Honor sort of assumes Mr. Brewer's reliability, but what do we have in the record? We have a statement from the police, Detective Krushanek and some of the other officers testified to this, that they work with loss prevention officers routinely. That's it. Nothing about, almost all the time we find these reports reliable, they always shake out, there's nothing about how reliable these reports are, how many of them hang out, how many don't. Number one. Number two. That's a requirement for reliability? Well, it's not a requirement, but certainly something. I mean, the police need something to say about whether this information is reliable. Let's assume you're not right on that. Where do you go from that point? Well, I mean, there's this, if I can just finish my thought on that briefly, one second. The other point about reliability is that there is, there's absolutely no record here, no track record from this particular loss prevention officer. And that should be clear in the record. There's, Detective Krushanek at one point said, he's worked with this person before, but Mr. Brewer took a stand and said, I've never been with him before. Isn't your best argument that it doesn't matter whether the report is reliable? He's the greatest guy of all time. Absolutely. Absolutely. These are the five facts that were related to the police officers, and it's not enough. Right. So reliability is key, but it's not a substitute for the content of the tape. I think that's a critical point. Let me ask you one question along those lines. I presume that the section of the mall that Mr. Adley went to after going into the Fendi store was in the opposite direction of where Mr. Verna had followed Mr. Dobson. Is that right? I'm just trying to get a visual fix, because obviously the question is, is there any kind of reasonableness to an inference that they somehow were together? Because if there's not, then why would you fit the fact that you saw Adley to help with the reasonable suspicions to stop Dobson? I think, Your Honor, you put your finger right on it, which is without evidence of together, without adequate evidence of them being together, there's really not. It's sort of lacking now. So that's the factual issue? Yeah. The record is unclear. What we know is that Dobson, Mr. Dobson, was trailed to the parking lot. It's not quite clear if that's the parking lot that's right outside of Bloomingdale's, or if perhaps he went into the mall for a few feet and then there was an exit there. It's not specified in the record. But what we do know is Mr. Adley, the second individual, was then trailed through the mall, okay? And then the King and Pershing Mall, I don't know if Your Honor is familiar with it, but the King and Pershing Mall has two wings that are connected, not internally, but they're an external crosswalk. So then Mr. Verna then followed Mr. Adley through the mall, through the men's department of Bloomingdale's, through the mall, out into it, and saw him go into the closet. So it's clearly not connected. Getting back to Curtis, Verna had a face-to-face discussion with Officer Bednar. Why doesn't that count for something? He also had the ability to sum up, to evaluate whether or not he was a reliable informant. Sure. So does that weigh in favor of the government's position to some extent? I don't know what to say, Your Honor. Face-to-face reports are important primarily for credibility determinations. Now, we're not... No one's saying that Mr. Verna's making this story up. The issue here is the quality of the information, and whether he's a first-hand reporter. That's really the two critical pieces, whether he has direct knowledge of this and whether the content of the tip is enough. So really judging someone face-to-face and having them tell you face-to-face what someone else told them in your security guard, no one thinks you're on the mark sort of making up a story. The face-to-face aspect of the tip doesn't really add much here. Well, it's good enough to... It's another aspect that an officer has to take into consideration in determining whether or not to stop someone for a terrorist op. Well, no. I think, actually, Your Honor, the face-to-face aspect is one criteria for the court to determine whether the police officer had... whether the tip was reliable. And, you know, all I'm saying is what you get out of the face-to-face tip is not really something that's lacking in this case. We're not making any allegation that Detective Verna was loose-cannoning off and... Don't say that. You are. You are. You are doing that. Because... You are doing that because you're saying that the officer couldn't rely upon this information as being substantial. Right. And that's because... Then you're saying his credibility is questioned. No, I'm not saying his credibility is at issue. I'm saying the content of what he delivered is at issue and the source of the information is at issue. Now, what Mr. Verna told the police was, my supervisor told me that, you know, we've had some problems in the past with New Yorkers. He said, you know, and that's a key element. So the police... If the court looks at, for instance, you know, the Brown case, the Torres case, this court has been very careful about looking at source of information and how that plays into whether a reasonable officer ought to... I think you're not convincing me on this point. But you... Let me ask my colleagues if you have any other... if there are any other questions. Okay, good. I'll have you back when we're done. Thank you, Your Honor. Thank you. Ms. McKeown. Good morning. Good morning, Your Honors. We oppose the court. My name is Bernadette McKeown and I represent the government in this matter. The officers here had reasonable suspicion to conduct a brief investigatory stop. I want you to keep your argument to what the officers actually do. I want to tell you, I take somewhat of an offense at your brief because you relied upon information that was not known to the officer at the time that Terry stopped the car and that was something that should never have been done. Yes, Your Honor. I agree with that. I think there was one paragraph in the argument... There was more than one paragraph. That was the implicit... It was not throughout, but quite a bit of your brief. It's devoted to information that the officers had no knowledge of. Well, I agree with you, Your Honor, that the analysis has to be confined to what the officers did. But you did it in your brief. I apologize, Your Honor. I did not write the brief down. I've read the record. I've recently been assigned to a case. I've read the record and I agree with it. We need to start with what did the officers know. But there's a broader issue at stake here and that is whether or not it's the reliability of the source and whether or not the officers were entitled to rely not just on those facts that were relayed to them but also to credit the security officer's conclusion that, in his experience, these events appear to be related. Let me ask you this question. So your adversary is focused on about five facts on page 26 of his brief, right? Yes. So would you concede that that's the totality of the information that was relayed to the officers before they stopped the car? With one proviso, and that is something I discussed with counsel yesterday. And I completely disagree. Yes. Counsel's brief notes in a footnote that there was some indication, at least in the record, that there was one additional fact and that is that the security officer told Officer Bednar that the first purchaser, the successful purchaser, who we'll later know as Mr. Dobson, had been seen in the store before with a New York ID. And at one point he says something that's a little bit ambiguous, but to my mind it indicates that he told her that the last time he made a suspicious purchase he had a New York ID. And that's found at page 305 in the appendix. I'm sorry, could you just... Yes. Okay, 305 in the appendix. 305 in the appendix. There is a statement that then is later followed up on page 319 in the appendix in cross-examination where Verna confirms that he told Officer Bednar that the first individual had been in the store before and used a New York ID. It's a slight question as to how much information was conveyed in that regard, but other than that, we would agree that those were the basic facts that were relayed to Officer Bednar. However, our position is that Officer Bednar and the other officers were entitled to rely on Verna's conclusions as to the events and the significance of the events that had occurred in the store. And that's because he was a reliable source. What did Verna say? What did Verna tell Bednar? Well, his entire message that he conveyed was that there were two suspects, that they believed the transactions were related and that Officer Bednar... Well, he said there were two people that they were watching for credit card fraud. I will piece you through the record if I have to, but Officer Bednar, when she testified, said that he believed these events were possibly... These meant the second suspect, who was clearly the one who was the focus of the investigation because he had presented two cards that were rejected. Then the information and the way it was conveyed led them to believe he was connected to this other individual and this other individual had also bought a Fendi bag. I won't go no further than that. I think that's... So the implication was that the two men were related, that the transactions were somehow related. And that was conveyed in a clear enough manner that I think that the officers were entitled to rely on this security officer's experience in this area and just the fact that he's a trained security officer in a major department store gives him an addition of reliability that does not attach to your anonymous tipster or even a private citizen. You seem to be... I hate conflating, but I'm going to use it anyway. Two issues. Your adversary is arguing... Here are the five or whatever the number are. You seem to argue there's another fact, so we'll say here are the six facts that were presented to the police and the police can draw whatever inferences are reasonable and that's how we're going to determine whether there's reasonable suspicion. Now you're injecting the following, which I want to make sure that I understand, that somehow we're to intuit that Verna made the leap for the police that here's the inference I would draw. These guys are working together. You'll probably find the other one with the first one in a car if you go up to it, and I'm wondering where that's coming from because I'm looking at Mr. Verna's testimony. I'm not getting what you're saying from his testimony. I can direct you to Officer Bender's testimony where she said that when she talked to him at the crosswalk, he also said this individual was possibly with two other males and described in the car. So I agree with Your Honor that when the dispatch report said there was a possible credit card fraud involving two men, two individuals at the store, at some point in the record that information appeared. I'll have to find that exactly for you. But in any event, if we go back to the facts that were relayed to the officer and, as Officer Bender said, that there was some connection between these two men, that's what he relayed, that there was a possible connection. That's why the car was an issue. We wouldn't have provided the description of the car or the description of both individuals had he not thought that there was some connection between these two men.  Because this was a security guard whose very job was to draw inferences and draw conclusions based on the events that Therese Pryor and the store report them to the police. That was his job. Did the district court make a finding either expressly or impliedly that there was some relationship between the two men that the officer knew at the time to stop the car? I don't believe so, Your Honor. I think that, no, I'm not sure if she highlighted in Officer Bender's testimony that there was a possibility that he was possibly with two other males in the car and then described the car, which is found on page 86 of the appendix. I'm not sure if she actually focused on that particular item. But, in any event... I didn't tell you from her opinion she doesn't. No, I didn't believe she did. And the Eighth Circuit recently addressed the situation involving security guards and said that because of their position and the responsibilities to their employer, their information is much less, there's much less risk that it's going to be inaccurate or that they're going to pursue a private agenda. I don't know that your adversary is focusing on a lack of credibility. No, he's not, but I am. Because I think it's important that we look at, under totality of circumstances, it's not just those six facts that were relayed. It's also that they're coming from a security officer who clearly has said that he believes the two men are at least together to some extent. And they're entitled to rely on that. I'm not sure where we're going to get that if the opinion doesn't state that. The record supports that, Your Honor. And I think the record supports that conclusion. But moving on to those particular facts, those facts themselves that were relayed to them by source officials or an experienced police officer to draw the conclusion that these two men might be connected. There's clear information conveyed about the second transaction. What did the officer have that he thought the two men were in some way connected at the time he stopped the car? Because Officer Benner had said to, or he had told Officer Benner that the two men were possibly related. And then when you look at the facts that he did tell the officer, which is they both got into the same counter in a relatively short period of time. Well, the time frame doesn't have specified that. The same counter is not among the facts that was relayed? They went to the Fandy counter in Bloomingdale's. So I was assuming that that was the same counter. But the officer, your position is that the record is quite clear that the officer did know that there was some suspicion that the two of them were in some way related to one another. Yes, I believe the record supports that conclusion and that that was conveyed to some extent to Officer Benner. Enough that that's why they were looking for this car. We wouldn't have given a description of the car if there wasn't some belief, and a reasonable belief, that there was a connection between these individuals. Is this about two African-Americans from New York? Because I wasn't sure from the record. I believe it. The fact that they were African-Americans is in the record, so I wasn't sure that it was a proper area of inquiry. But now from your adversary, it would appear that it is. You concede that, or you don't think that it's in the record? Oh, I think that it might not be explicitly in the record, but certainly by the time that Verna meets Officer Benner in the crosswalk and provides a description of both men, whether or not that's broadcast or not is irrelevant. I would say, yes, that that is made clear in the record, just the way I believe that the connection was made clear, just by the fact that he's reporting this car, providing this information, and saying that there was a purchase that was successful involved in offending him. He's clearly saying to the officer that these, at least in his opinion, these events relate, and he is a reliable source, and the officers were entitled to rely on this. But the point is that the content of the facts, the facts that he then relayed to them, supported his conclusion that these two men may well be related. And again, we come back to the standard here, which is reasonable suspicion. Is there a suspicion that these two men may be linked together? Is there a reasonable suspicion that at least one occupant of this car may have something to do with credit card fraud? Unless the officers did have that reasonable suspicion. I'm sorry, why would there be? A person made a valid purchase, got in a car. It's clear from the record that the other person who was unable to complete a transaction is not anywhere near that car. So when you say the inference, you mean the inference from the facts is that Dobson engaged in a questionable credit card transaction? Even if we don't go that far, there's another inference, which is that a trained police officer could certainly draw a conclusion from these facts, would be that if the two men were indeed together and they were trying to commit credit card fraud to purchase expensive items, they wouldn't necessarily appear together. They both had New York IDs. The car had New York license plates. There is an inference that they could draw that the person on foot, Mr. Abney, was headed back to meet up with these individuals in the car so that he could very well have been an occupant of the car. There are two assumptions, and I'm not suggesting that only the first assumption was one that a reasonable officer would draw. Maybe they wouldn't draw that assumption, but they could infer that Dobson and Abney came to hook up again. If they indeed were related. And when you look at the totality of the circumstances, as the district court did here in a very careful fashion, I might add, I believe that it is sufficient to support the conclusion that a limited investigatory stop was warranted. We have to remember what the purpose of a terror stop is, as Judge Cameron mentioned before. It is a limited intrusion on a person's privacy. It is to stop the car, ask a few questions. Depending on the answers, that may be the very end of it. The defense suggests at one point that the police could have waited and waited for a traffic violation and then stopped them and tried to develop more reasonable suspicion. But that's elevating reasonable suspicion to probable cause, and I think that permeates their argument here. If these suspects had been white instead of black, do you think the officers would have made the stop? I have no idea, Your Honor. I have no idea. I think it was... I would say that we have to deal with the record we have here. And here, remember, it goes back to Bloomingdale's as well, where the people, not only Officer Verna, but also the store employees are trained to detect credit card fraud or any suspicious activities and report it. The clerk here reported the activity up the chain, and then so I... Officer Verna also knew repercussions of being. He wants to actually... Is Verna the key link in your view here? That is, without... not Officer Verna, Detective Verna, the store detective Verna, without his involvement, would there have been sufficient information to stop these individuals? Without Security Officer Verna's involvement? Yes. I don't... then I don't know what information would have been conveyed, just a vague report of a possible credit card fraud, so I don't think there would be. But Verna's... it's not Verna's... the reasonableness necessarily of Verna's conclusions, it's whether or not the officers were reasonable on taking the facts that they were given, the information provided by Verna, and relying on that information in determining that there was reasonable suspicion to believe that at least one occupant of the car, and that was limited to one, was involved in credit card fraud and making a quick investigatory stop for that purpose. And the bottom line is the district court found it was, in very careful opinion, and the government believes that those facts are sufficient. We have reliability, we have the content of the information, and we also have the fact that the officers... I mean, we can't discount the fact that the officers are... they have to make a quick decision. They have a limited amount of time. They can stop or do a follow-up investigation... This isn't one of those situations where safety is involved, that they've got to make, you know, a snap decision. You know, it's not a safety issue, but again, the decision was to make a brief investigatory stop while the events are fresh and there may be evidence at hand, or do they have to wait to go back and talk to everybody who was involved in some aspect of this in the store? And my answer would be no, that they don't have the obligation to do that, that they weren't having to rely on the reliable information supplied by the officer, and then the facts were probably sufficient. I see our time is up. Any other questions? Thank you. Any other questions? Good. Thank you very much, Mr. Schweitzer. Can I just start with the point that your adversary made, that the additional facts that we had... Of course. Yeah, I would rather believe in the point. I would point your honors to the blue brief, footnote 5. That's where the various testimony is, and the critical point is the district court actually did fact-finding about what was told to the police, and the district court found that what was told to the police was that it was New Yorkers, and you've illustrated New Yorker problems with New Yorkers and credit cards. So footnote 5 points the court to the various testimony and how the district court resolved it. I don't think anything is really challenging here on the peer of the district court's fact-findings, so I would submit that that should clear up that issue there. Now, as to the detective... As to the detective permit, the detective permit is... I'm looking for a little red herring here. If the police officers could see all of this directly, there's not a reasonable suspicion. So the notion that somehow we can clothe this tip with super-reliability or super-credibility because of Detective Verna, who has been fired from his last job for making an unproductive stop, and who had no record evidence of the training, or I hear a lot about training and all this sort of stuff. Nothing's on the record. Nothing's on the record whatsoever. Nothing in the record about how many of these tips from the Walsh Convention folks that they couldn't push them off came out. So that's... Verna is a red herring. What we really need to look at is... And I didn't hear anything else from the other side of the podium other than this factual issue, which I don't think is pertinent. I didn't hear anything else besides daytiming and African-Americans from New York. That's what the suspicion was. There's no doubt that William Mills and Mr. Verna were suspicious. The question for us is, was it reasonable? And it wasn't, and it wasn't. And we can see that by all of the information that was not here. And we can see it by the fact that what was conveyed to the officers was there's nothing except the hunch. There's nothing, nothing connecting these two individuals together. The hunches are enough. If the police, the report had been that the two men were obviously seen getting in the car together, anything like that, this would be a different case. That's not what we have here. I'll refer just very briefly... Your Honor asked a question about the race of the suspects and so forth. In addition to the dispatch, and the caught findings in fact, the disapproval of the suspects' race and so forth and other places, my colleague mentioned the Robinson case at the circuit we did a test at yesterday. This is a case that gives some credence to the fact that the tip comes from a security guard. I won't go into that in detail because of the reasons I said before. I think it's a red herring. But when you look at that case, that case says, well, when the tip comes from the security guard, we can suppose that he's got credibility in the sense that he's not making it up. He doesn't want to get fired. He doesn't want that. He doesn't want to embarrass himself and so forth. There's no allegation here that Mr. Vernon's making anything up. Mr. Vernon got weak, weak, weak information from the sales clerk and passed it along. There's no credibility issue. There's nothing to judge face-to-face from Mr. Vernon. He's reporting what someone else told him about what happened at the defendant counter. That's all. And that's not enough. Thank you. Thank you very much, Mr. Switzer. The case will be well argued. We'll take the matter under advisement. Thank you.